**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARMIN MINER, *et al.*, | |
| Plaintiffs, | Civil Action No. 13-633 (BAH) |
| v. | Judge Beryl A. Howell |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

The two plaintiffs in this matter, Charmin Miner and Gary Baldwin, allege that the defendants, the District of Columbia and four District of Columbia Metropolitan Police Department ("MPD") Officers, violated the plaintiffs' constitutional and common law rights during a traffic stop at the Anacostia Metro Station in Southeast Washington, D.C. *See generally* First Am. Compl. ("FAC"), ECF No. 13. The defendants now seek summary judgment, pursuant to Federal Rule of Civil Procedure 56, on all claims. Defs.' Mot. Summ. J. ("Defs.' Mot.") at 1–2, ECF No. 26. For the reasons set forth below, the defendants' motion is granted in part and denied in part.

## I.      BACKGROUND

The parties dispute many aspects, and the import, of the events giving rise to the instant suit. *Compare* Defs.' Statement of Undisputed Material Facts ("Defs.' SMF"), ECF No. 26, *with* Pls.' Resp. Defs.' SMF ("Pls.' SMF"), ECF No. 28-1. The factual allegations set out in the FAC, as supported and supplemented by the record, are summarized here, with relevant disputes identified where necessary.

On February 6, 2012, the plaintiffs "were dropping their friend off at his apartment when they noticed another vehicle pull in front of them."  Defs.' SMF ¶ 1.  As the plaintiffs drove away, the vehicle they had previously noticed "backed up and traveled in the same direction as they did."  *Id.* ¶ 2.  The plaintiffs allege that, in doing so, the unidentified vehicle "started chasing [them]" through a nearby alley, driving so quickly as to stir up road debris as it passed. Pls.' SMF ¶ 2.  Alarmed, the plaintiffs admit that Plaintiff Miner, who was driving, "began to make 'quick' lefts and 'quick' rights to lose the [other] vehicle . . . traveling at about 50 or 60 miles per hour," Defs.' SMF ¶¶ 3–4, although the plaintiffs contend that, at least initially, the plaintiffs were attempting to allow the unidentified vehicle "to get around [them]," Pls.' SMF ¶ 3.  The unidentified vehicle was only identified as an unmarked police SUV at the time of the plaintiffs' stop and detention.  FAC ¶¶ 10, 15, 19.  The plaintiffs allege that when the defendant officers allegedly began chasing the plaintiff's vehicle, the defendant officers had no probable cause to detain them, a state of affairs that continued at the Anacostia Metro Station.  *See* FAC ¶¶ 64–66.

As the defendants continued following the plaintiffs, the plaintiffs believed they were being chased by unknown assailants, Pls.' SMF ¶ 5, eventually resulting in the plaintiff driving "on the wrong side of the street" at up to "80 or 90 miles per hour," Defs.' SMF ¶ 5.  After approximately five minutes, the plaintiffs believed "that they had lost the [other] vehicle," but upon seeing the vehicle again, the plaintiffs again began to speed to escape.  Defs.' SMF ¶ 6. Eventually, the plaintiffs "drove into a 'one-way' street that was labeled with a 'Do Not Enter' sign traveling at about 70 miles per hour" at the Anacostia Metro Station.  Defs.' SMF ¶ 7.  The plaintiffs "believe that, when pursued, they were being subjected to a carjacking or gang

intimidation" and therefore "sought to drive [their] vehicle to an open, well-illuminated area." FAC ¶¶ 13–14.

Plaintiff Miner states that as he approached the Metro Station he "was really looking for a police officer, or somebody to run to," Pls.' Opp'n Defs.' Mot. Summ. J. ("Pls.' Opp'n") Ex. 1 (Dep. of Plaintiff Charmin Miner ("Pl. Miner's Dep.")) at 29:5-7, ECF No. 28-3.  Plaintiff Miner avers that he came to a stop next to a Washington Metropolitan Area Transit Authority ("Metro") Police Officer, to whom he stated "somebody's chasing me, somebody's chasing me." *Id.* at 29:18-19.

Shortly after Plaintiff Miner brought his vehicle to a halt, four people, later identified as MPD officers, emerged from the pursuing SUV and "yelled to [the plaintiffs] 'Where the guns and drugs at?'" Defs.' SMF ¶ 8.  The plaintiffs allege that at this time, the four MPD officers "pulled Mr. Miner and Mr. Baldwin from Mr. Miner's vehicle, threw them on the ground, and put guns against their bodies, *i.e.*, their heads and backs."  FAC ¶ 14.  Plaintiff Baldwin stated at his deposition that an unknown officer "just came over and you know, took his hand and pushed my back down and put the knee on my back, you know, make sure I wouldn't go nowhere." Defs.' SMF ¶ 9.  Plaintiff Miner alleges that "Officer Elliott" grabbed him by the shirt "and threw [him] on the ground," Defs.' SMF ¶ 11, "pointed [a] gun at Plaintiff [Miner's] head," Pls.' SMF ¶ 11, and stepped on Plaintiff Miner's glasses, which had fallen off his face, Defs.' SMF ¶ 11.  As Plaintiff Miner was being "forced into a passive position on the ground," Plaintiff Miner avers that he "asked the officers several times why they did not turn on their lights or sirens," but did not receive an answer.  FAC ¶ 19.  Plaintiff Miner also alleges that he was "picked . . . up off the ground and . . . put on the hood of [a] car," Defs.' SMF ¶ 13, after Plaintiff Miner had his hands placed behind his back, *id.* ¶ 12.  Both plaintiffs allege that as a result of these actions,

including the MPD officers "aggressively point[ing] guns" at them, the plaintiffs were put "in fear for their lives."  FAC ¶ 17.

The plaintiffs allege that they were detained "against their will and without legal justification for approximately one half hour," FAC ¶ 20, during which time "the officers asked for and ran their names in the system," after which the plaintiffs were told "they were free to leave."  Defs.' SMF ¶ 14.  Plaintiff Miner was not issued a traffic citation.  FAC ¶ 22.

The next day, Plaintiff Miner "spoke with Assistant Chief of Police Diane Groomes and told her about the incident."  FAC ¶ 23.  After documenting his allegations in an email on February 8, 2012, "Assistant Chief Groomes acknowledged Mr. Miner's email and wrote that his complaint would be forwarded to MPD's Internal Affairs Division."  *Id.*  Plaintiff Miner was later contacted by an MPD Lieutenant, who interviewed Plaintiff Miner regarding the incident. *Id.* ¶ 24.  The plaintiffs were later informed that "MPD found that there were insufficient facts to substantiate Mr. Miner's complaint," and that the officers involved were "not discipline[d] . . . for the February 6, 2012 incident, although MPD did discipline them for not patrolling their assigned area on that date."  *Id.* ¶ 25.

The plaintiffs allege nine causes of action under common law and Federal law: Count I for common law "False Detention and/or False Arrest," FAC ¶¶ 35–37; Count II for common law "Assault," *id.* ¶¶ 38–40; Count III for common law "Battery," *id.* ¶¶ 41–43; Count IV for common law "Negligent Supervision," *id.* ¶¶ 44–46; Count V for "Negligent Supervision under" 42 U.S.C. § 1983, *id.* ¶¶ 47–57; Count VI for violation of the plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures, pursuant to 42 U.S.C. § 1983, against the District of Columbia, *id.* ¶¶ 58–62; Count VII for violation of the plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures, pursuant to 42 U.S.C. § 1983, against

the individual MPD officers, *id.* ¶ 63–66; Count VIII for violation of the plaintiffs' Fourth

Amendment right to be free from the use of excessive force during a seizure, pursuant to 42

U.S.C. § 1983, against the District of Columbia, *id.* ¶¶ 67–72; and Count IX for violation of the

plaintiffs' Fourth Amendment right to be free from the use of excessive force during a seizure,

pursuant to 42 U.S.C. § 1983, against the individual MPD officers, *id.* ¶¶ 73–77.

The plaintiffs initially filed this matter in D.C. Superior Court and the defendants

removed the case to this Court.  Joint Not. Removal at 1, ECF No. 1.  MPD Chief Cathy Lanier

and former District of Columbia Mayor Vincent Gray, who were named as defendants in the

initial complaint, was dismissed upon the defendants' motion at a hearing held November 1,

2013.  Minute Order, Nov. 1, 2013.  Following discovery, the defendants have moved for

summary judgment on all remaining claims against all remaining defendants.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is properly

granted against a party who, "after adequate time for discovery and upon motion, . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a

genuine issue of material fact" in dispute.  *Id.* at 323.

In ruling on a motion for summary judgment, the Court must draw all justifiable

inferences in favor of the nonmoving party and accept the nonmoving party's evidence as true.

*Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (per curiam); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986). As the Supreme Court recently stressed, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249). When a court "fail[s] to credit evidence" presented by the nonmovant "that contradict[s] some of its key factual conclusions, the court improperly weigh[s] the evidence and resolve[s] disputed issues in favor of the moving party." *Id*. at 1866 (internal quotations and citations omitted).

In evaluating the evidence offered at summary judgment, the Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). Discerning whether a genuine factual dispute requires presentation to a jury "is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011). To be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Anderson*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *see also Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in that party's favor on all essential elements of the claim on which that party will bear the burden of proof at trial. *See* FED. R. CIV. P. 56(c)(1); *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (noting that at the summary judgment stage, plaintiff "can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which for purposes of the summary judgment motion will be taken to be true,'" quoting *Sierra Club v. EPA*, 292 F.3d 895, 898–99 (D.C. Cir. 2002) (ellipsis in original));

*see also Solomon v. Vilsack*, 763 F.3d 1, 12 (D.C. Cir. 2014); *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III.   DISCUSSION

The plaintiffs' claims can be generally divided into two categories: those against the municipality and those against the individual MPD officers. Four claims are raised exclusively against the municipality: common law negligent supervision (Count IV); negligent supervision, pursuant to 42 U.S.C. § 1983 (Count V); and Fourth Amendment false arrest and excessive force violations, pursuant to 42 U.S.C. § 1983 (Counts VI and VIII, respectively). The remaining five claims in Counts I, II, III, VII, and IX, are raised against the individual MPD officers. The claims against the municipality are examined first before turning to the claims against the individual officers.

### A.    Summary Judgment Is Warranted In Favor Of The District of Columbia On All Claims Against The Municipality In Counts IV, V, VI, and VIII

In a Section 1983 suit, alleging violation of constitutional rights by an individual acting under color of state law, the District of Columbia, as a municipality, "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original). Instead, to succeed on a Section 1983 claim against a municipality, the plaintiff must show both a predicate violation of some right, privilege, or immunity secured by the Constitution or laws of the United States, *see* 42 U.S.C. § 1983, and "that the municipality's custom or policy caused the violation." *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 123–24 (1992)). The

7

plaintiffs appear to concede this requirement by arguing in their opposition that "evidence that the officers' inappropriate actions are accepted by policymakers . . . establishes municipal liability."  Pls.' Opp'n at 6.  The defendants do not argue, nor does the Court need to address, the first prong of the test, the presence of a predicate violation, since the plaintiffs have failed to put forward the evidence necessary to prove municipal liability.

The plaintiffs are correct that one of three recognized methods for showing that a municipal policy or custom caused a constitutional violation for Section 1983 purposes is that "the municipality or one of its policymakers explicitly adopted the policy that was 'the moving force of the constitutional violation.'"  *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011).  In the plaintiffs' view, Assistant Chief Groomes "condoned" the individual officers' behavior in following and stopping the plaintiffs without reason and using excessive force against them during the stop.  Pls.' Opp'n at 6–7.  Yet, the plaintiffs admit that Assistant Chief Groomes opened an investigation into the defendant officers' conduct and disciplined them for leaving their designated patrol area.  Pls.' SMF ¶ 16.  Nevertheless, following the investigation, the plaintiffs contend that the failure to find sufficient facts "to support Mr. Miner's allegations and failing to discipline the officers for any of their actions other than patrolling the wrong area" constitutes the "acceptance of the officers' conduct."  *Id.*  At base, then, the plaintiffs are challenging the municipal defendant's actions in investigating the plaintiffs' claims and, after finding insufficient evidence to support those claims, failing to discipline the officers involved despite the insufficient evidence.  *See id.*  Assuming, *arguendo*, that these actions could constitute "condoning" the officers' behavior, the plaintiffs have offered no evidence that Assistant Chief Groomes is a "policymaker" for the District of Columbia.

The Supreme Court has interpreted the term "policymaker" narrowly, noting that "when a subordinate's decision is subject to review by the municipality's authorized policymakers," those policymakers "have retained the authority to measure the official's conduct for conformance with *their* policies." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988) (emphasis in original). In this Circuit, courts "have held that a final policy maker 'typically must be at least an agency head or the governing body of an agency.'" *Allen-Brown v. District of Columbia*, No. 13-1341, 2014 WL 3051021, at *4 (D.D.C. July 7, 2014) (quoting *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011)). This requirement is in accord with the D.C. Circuit's holding in *Tripett v. District of Columbia*, that "[t]he only acts that count" for *Monell* purposes "are ones by a person or persons who 'have final policymaking authority [under] state law.'" 108 F.3d 1450, 1453 (D.C. Cir. 1997) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

In *Allen-Brown*, the court found that the "Director of MPD's Medical Services Branch" was not a "policymaker" for municipal liability purposes, since "there was nothing in the record to indicate that [the Director] makes broad departmental policy decisions at all." *Allen-Brown*, 2014 WL 3051021, at *5. Other similarly high-ranking government officials who fell short of being the person with whom, for lack of a better term, the "buck stops," have been found insufficiently empowered to trigger municipal liability. *See, e.g.*, *Sheller-Paire v. Gray*, 888 F. Supp. 2d 34, 40 (D.D.C. 2012) (finding assistant fire chief and fire "Department's upper management" insufficiently empowered to impute municipal liability as final decision-making authorities); *Coleman*, 828 F. Supp. 2d at 91–92 (finding both Assistant Fire Chief and overall Chief of Fire Department insufficiently empowered to impute municipal liability absent statutory grant of final authority over Department actions); *Byrd v. District of Columbia*, 807 F. Supp. 2d

37, 75 (D.D.C. 2011) (finding Director of D.C. Parks and Recreation Department insufficiently

empowered to impute municipal liability absent statutory grant of final authority over

Department actions).

In the District of Columbia, the Mayor is ultimately responsible for the police

department, *see* D.C. Code § 5-101.03, and the Mayor appoints a Chief of Police, "with the

advice and consent of the [City] Council," D.C. Code § 5-105.01(a-1)(1), to administer the

police department.  All police officers are required to "respect and obey the Chief of Police as

the head and chief of the police force, subject to the rules, regulations, and general orders of the

Council of the District of Columbia and the Mayor of the District of Columbia." D.C. Code § 5-

127.03.  Thus, by law, police officers below the level of the Chief of Police—and, arguably, the

Chief herself, *see Coleman*, 828 F. Supp. 2d at 92 (finding Fire Department Chief non-

"policymaker" because, *inter alia*, the "Mayor and the City Council have expressly reserved

supervisory powers to themselves")—are subordinates whose "decision[s are] subject to review

by the municipality's authorized policymakers." *See Praprotnik,* 485 U.S. at 127.

Set against the legal background, the conclusion is clear: even assuming that Assistant

Chief Groomes "condoned" the actions of the four MPD officers at issue in this matter, the

plaintiffs have submitted no evidence that Assistant Chief Groomes is imbued with the final

authority necessary to qualify as a "policymaker" for *Monell* purposes.  Moreover, as described

above, the statutory scheme would appear to foreclose holding a municipality liable for an

Assistant Chief's actions.  Assistant Chief Groomes is not a "policymaker" such that her actions

can be attributed to the municipality.  *See id.*; *see also Tripett v. District of Columbia*, 108 F.3d

at 1453 (noting in similar D.C. Code provision where Mayor appointed Director of Department

of Corrections, said Director, Mayor, and City Council were "policymakers" for Section 1983

purposes).  Thus, the plaintiffs' policymaker theory must fail and summary judgment must be granted to the District of Columbia on the plaintiffs' claims under Section 1983, since the plaintiff has failed to satisfy *Monell*'s requirement by identifying a policy or custom that caused the plaintiffs' alleged injuries.

The plaintiffs also assert a "deliberate indifference theory" of municipal liability, predicated on the notion that Assistant Chief Groomes' "condon[ed]" the officers' actions by acquiescing "in longstanding practice or custom which constitutes standard operating procedure."  Pls.' Opp'n at 6–7.  Courts determine whether municipal liability may lie on such a theory "by analyzing whether the municipality knew or should have known of the risk of constitutional violations, but did not act."  *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004) (internal quotation marks omitted).  In other words, "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction."  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994)).

The plaintiff fails to present evidence to show that the municipality in this case had "actual or constructive knowledge that its agents will probably violate constitutional rights."  *Id.* As support for its theory, the plaintiff produced a study conducted between 1994 and 1999 that found issues with MPD officers' use of force, specifically, that MPD officers were using excessive force too often.  *See* Pls.' Opp'n at 7.  This single study, which was more than a decade old at the time of the incident, also noted that the MPD had made strides by 1999, when the study was published, in improving its compliance with the law regarding excessive force. U.S. Dep't of Justice, *Findings Letter re: Use of Force by the Washington Metropolitan Police Department*, (no date), *available at* http://www.justice.gov/crt/about/spl/documents/dcfindings.php.  Thus, in addition to being stale,

the study itself would seem to indicate that the MPD was moving in the right direction and had no reason to know it had any current issues when the events giving rise to the instant complaint occurred.  *See Moore v. District of Columbia*, 2015 WL 474532, at *14 (D.D.C. Feb. 5, 2015) (finding eight-year-old study showing pattern of lack of probable cause for disorderly conduct arrests too remote in time to support notice of potential policy or custom in MPD at summary judgment stage).  Consequently, Counts V, VI, and VIII, all of which assert claims against the District of Columbia under Section 1983, are dismissed.

The sole remaining claim against the District of Columbia is Count IV, which alleges common law negligent supervision for failing to ensure that the individual officers did not violate the plaintiffs' constitutional rights.  FAC ¶¶ 44–46.  For a common law negligent supervision claim to succeed in the District of Columbia,[1] the plaintiff must "show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee."  *District of Columbia v. Tulin*, 994 A.2d 788, 794 (D.C. 2010) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)); *accord Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 114 (D.D.C. 2011).  Negligence actions require that the plaintiff "establish[] three elements: (1) the applicable standard of care; (2) a deviation from that standard by the defendant, and (3) a causal relationship between the deviation and the injury."  *Robinson v. Wash. Metro. Area Transit Auth.*, 774 F.3d 33, 38 (D.C. Cir. 2014) (quoting

---

[1] Although the parties do not address this issue, the Court applies the law of the forum state—in this instance, the District of Columbia—when adjudicating common law claims.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. . . . [t]here is no federal general common law."); *see also*, CHARLES ALAN WRIGHT AND ARTHUR R. MILLER, *ET AL.*, 19 FED. PRACTICE & PROC. JURIS. § 4520 (2d ed.) (noting *Erie* doctrine applies in in non-diversity cases).

12

*Varner v. District of* Columbia, 891 A.2d 260, 265 (D.C. 2006)) (internal quotation marks omitted).

The defendants correctly point out that the plaintiffs have failed to identify an expert to establish the standard of care the defendants allegedly breached.  Defs.' Mem. Supp. Defs.' Mot. ("Defs.' Mem.") at 6, ECF No. 26.  Under District of Columbia law, "where the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson, the plaintiff must proffer expert testimony to establish the applicable standard of care."  *Robinson*, 774 F.3d at 39 (internal quotation marks and citations omitted).  Although the plaintiffs rely on *Wesby v. District of Columbia*, 841 F. Supp. 2d 20, 48 (D.D.C. 2012), for the principle that "expert testimony is [not] required in all police negligent supervision cases," *Wesby* is distinguishable on its facts in a manner that is fatal to the plaintiffs' claim.

In affirming the District Court's holding that an expert on the standard of care for supervising police officers was not required in *Wesby*, the D.C. Circuit acknowledged that "courts often require expert testimony where the training and supervision of police officers is concerned," but found that "the fact that the supervising official was on the scene and directed the officers to make the unlawful arrests distinguishe[d]" *Wesby* from those cases.  *Wesby v. District of Columbia*, 765 F.3d 13, 30 (D.C. Cir. 2014).  In the instant matter, there is no contention that Assistant Chief Groomes was "on the scene" with the officers at the Anacostia Metro Station.  Thus, the instant matter falls into the realm of cases where "expert testimony is routinely required," because the negligence at issue "involves issues of safety, security and crime prevention."  *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845–46 (D.C. Cir. 2007).  Asking a jury to evaluate the appropriate standard of care in supervising police officers would

result in the jury being "forced to engage in idle speculation regarding the duty of care governing . . . the training of [the defendants'] employees, and such speculation on the part of a jury is not permissible." *Parker v. Grand Hyatt Hotel*, 124 F. Supp. 2d 79, 90 (D.D.C. 2000).  Although *Wesby* stands for the proposition that expert testimony may not be necessary when a supervisor is present on the scene of an incident, such an exception does not apply to the instant case, meaning the plaintiffs' failure to identify an expert for the purpose of establishing the requisite standard of care is fatal to the plaintiffs' negligent supervision claim.  *See Briggs*, 481 F.3d at 845–46.  Consequently, Defendant District of Columbia's motion for summary judgment as to Count IV is granted.

## B. Material Factual Disputes Preclude Summary Judgment In Favor Of The Individual Officers On Counts I, II, III, VII, and IX

The remaining counts against the individual officers involve myriad factual disputes that preclude summary judgment for either party.  The validity of Counts I and VII, which allege common law false detention and seizure, respectively, in violation of the Fourth Amendment under Section 1983, rests on whether the officers in question had probable cause to detain the plaintiffs.  *See Scott v. District of Columbia*, 101 F.3d 748, 753–54 (D.C. Cir. 1996) ("The elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim . . . the focal point of the action is the question whether the arresting officer was justified in ordering the arrest of the plaintiff.").  The defendants incorrectly assert that the Court may not look beyond the plaintiffs' statements and pleadings in evaluating this Rule 56 motion.  Defs.' Reply Pls.' Opp'n Defs.' Mot. ("Defs.' Reply") at 1, ECF No. 29 (stating that "the District's motion is based on Plaintiffs' testimony concerning their encounter with the police" and asserting that deposition testimony of the officers involved is "a red-herring").  To the contrary, the Court may examine the entire record for the purposes of a Rule

14

56 motion, and the Court must "consider . . . the cited materials" in the parties' memoranda. FED. R. CIV. P. 56(c)(2).

The defendants assert that the plaintiffs' own admissions that they were driving in an erratic manner necessarily demonstrate that the defendant officers had probable cause to stop them. Defs.' Mem. at 8–9; Defs.' Reply at 12–13. This argument is substantially undercut by the defendant officers' deposition testimony, denying that the officers chased the plaintiffs or observed them committing any traffic infractions. Pls.' Opp'n at 4 (citing depositions of Officers Leboo and Torres). The plaintiffs' admissions about driving over the speed limit and the wrong way on a roadway while fleeing from perceived threats from a pursuing vehicle, *see* Pls.' SMF ¶ 5, would likely constitute probable cause for stopping the plaintiffs, if the officers admitted to observing these traffic infractions. Notably, the defendant officers do not admit to chasing the plaintiffs and, thereby, appear to foreclose the possibility that they observed the plaintiffs engaging in those acts. *See, e.g.*, Pls.' Opp'n Ex. 7 (MPD "Final Investigative Report," Mar. 12, 2012) at 8, ECF No. 28-9 (statement from officer involved in incident that the officers "did not engage in a vehicular pursuit"). At least one officer stated during the subsequent MPD internal investigation that the officers did not chase the plaintiffs because their vehicle lacked the engine power to conduct a high speed chase and "because they know better than to chase." *Id.* at 10–11. Indeed, for MPD officers to engage in a high-speed chase under the circumstances alleged in this case, may have violated MPD policy, *see* MPD Gen. Order 301.03 (Vehicular Pursuits), Feb. 25, 2003, *available at* https://go.mpdonline.com/GO/GO_301_03.pdf, and this potential violation may be contributing to the unusually sharp and ironic divergence in accounts between the plaintiffs, who fully admit to traffic violations, in the face of the defendant officers' denial of observing them. In any event, based upon the Court's review of the entire record, a genuine

dispute of material fact clearly exists as to whether the defendant officers had probable cause to stop the plaintiffs since the parties dispute whether the defendant officers actually witnessed Plaintiff Miner driving in an erratic manner with Plaintiff Baldwin in the vehicle. Thus, the defendants' motion for summary judgment as to Counts I and VII is denied.

Counts II, III, and IX, for common law battery, assault, and the use of excessive force, respectively, are also subject to material factual disputes that preclude summary judgment. The material dispute as to whether the defendant officers observed any traffic infractions, or are able to articulate any reasonable suspicion to stop the plaintiffs' vehicle such that a half-hour search of the plaintiffs' vehicle and detention of the plaintiffs was reasonable, *see Terry v. Ohio*, 392 U.S. 1, 18–19 (1968); *Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 94 (D.D.C. 2011), leads directly to a material dispute as to whether the defendant officers were authorized to use any force against the plaintiffs, let alone whether the defendants' knowledge at the time of the stop supported the actions alleged by the plaintiffs, *see Hundley v. District of Columbia*, 494 F.3d 1097, 1101 (D.C. Cir. 2007) (holding that "an unreasonable use of force" under Section 1983 "also is an assault and battery under D.C. law").

Since clear issues of material fact persist pertaining to the knowledge of the defendants at the time they stopped the plaintiffs, as well as the actions that occurred before and during the stop, summary judgment is precluded as to the defendant officers on Counts I, II, III, VII, and IX.

## IV.   CONCLUSION

For the foregoing reasons, the defendants' motion is granted in part and denied in part. The defendants' motion is granted as to the counts against the District of Columbia, namely, Counts IV, V, VI, and VIII. The defendants' motion is denied as to the counts against the

individual officers, namely, Counts I, II, III, VII, and IX.  Since all dispositive motions have been resolved, the remaining parties shall appear for a pre-trial conference on June 19, 2015 at 10:00 a.m. in Courtroom 15, unless the parties seek referral to a Magistrate Judge for mediation or settlement negotiations.  Absent such a referral, the parties shall be prepared to begin trial with *voir dire* at 9:15 a.m. on June 29, 2015 in Courtroom 15.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

Date: April 9, 2015

_____
BERYL A. HOWELL
United States District Judge